J-S58014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| SHAMAR ALMAR MCCOWIN, | |
| Appellant | No. 1873 MDA 2014 |

Appeal from the Judgment of Sentence March 24, 2014
in the Court of Common Pleas of York County
Criminal Division at No.: CP-67-CR-0003715-2013

BEFORE: GANTMAN, P.J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.: **FILED NOVEMBER 12, 2015**

Appellant, Shamar Almar McCowin, appeals from the sentence imposed following his jury conviction of murder of the second degree, robbery and criminal conspiracy. Appellant challenges the sufficiency and the weight of the evidence. We affirm on the basis of the trial court opinion.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them at length. We note briefly for context and the convenience of the reader that Appellant's conviction arose out of the shooting murder of Edward Green during a carjacking. Mr. Green was homeless and living in his car.

---

[*] Retired Senior Judge assigned to the Superior Court.

Malcolm Bull, formerly Appellant's best friend, pleaded guilty to the charges in the present case, (and to an earlier unrelated attempted murder of Ronald Rhodes, not involving Appellant). Initially uncooperative with the police, at trial Bull identified Appellant as the shooter of Edward Green. In exchange for his testimony, the Commonwealth agreed to recommend that his sentence for both incidents be limited to twenty to forty years' incarceration. The court sentenced Appellant to life imprisonment. This appeal followed.

Appellant presents two questions on appeal:

> I. Whether the Commonwealth presented sufficient evidence at trial to support convictions for the offenses of Murder in the Second Degree, Robbery and Criminal Conspiracy to Commit Robbery?
>
> II. Whether the Appellant's convictions for Murder in the Second Degree, Robbery and Criminal Conspiracy to Commit Robbery were against the weight of the evidence presented at trial?

(Appellant's Brief, at 4).

On appeal, Appellant argues that physical evidence failed to link him to the crime scene. He maintains that he was convicted chiefly on the testimony of Bull, who had previously lied to the police, and who testified in exchange for a sentence agreement.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that there is no merit to the issues Appellant has raised on appeal. The trial

court opinion properly disposes of the questions presented. (**See** Trial Court Opinion, 12/22/14, at 15-20) (concluding: (1) both of Appellant's claims are waived for failure to state specifically which crimes or elements of the crimes are being challenged; moreover, (2) the Commonwealth presented sufficient evidence on each charge to prove all elements of the crimes for which he was convicted, beyond a reasonable doubt; (3) the jury, which heard about Bull's misdeeds, and his sentencing deal, nevertheless could reasonably have found his testimony credible; and (4) the verdict did not shock the trial court's sense of justice). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/12/2015</u>

558 014-15

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA CRIMINAL DIVISION

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CP-67-CR-0003715-2013 |
| | : | |
| vs. | : | Super. Ct. No. 1873 MDA 2014 |
| | : | |
| Shamar A. McCowin | : | |
| | : | |

## OPINION PURSUANT TO RULE 1925(a) OF THE PENNSYLVANIA RULES OF APPELLATE PROCEDURE

On February 14, 2014, the Appellant, Shamar McCowin, was found guilty of Count 3 Robbery,[1] Count 4 Criminal Conspiracy to Robbery,[2] and Count 8 Murder of the Second Degree.[3] The Appellant was sentenced to life imprisonment on March 24, 2014. The Appellant filed a Post-Sentence Motion on April 3, 2014, which we denied on July 29, 2014. The Appellant filed his initial Notice of Appeal to the Superior Court on August 4, 2014, docketed at 1318 MDA 2014. On the same day, the Appellant's attorney, Marc Semke, Esquire, filed a Motion to Withdraw and Appoint New Counsel. On August 5, 2014, we appointed Korey Leslie, Esquire, and directed the Appellant to file his 1925(b) Statement. We granted defense counsel's request to extend the time to file his Concise Statement on August 28, 2014.

On September 25, 2014, the Superior Court dismissed the case for failure of defense counsel to comply with Pennsylvania Rule of Appellate Procedure 3517.[4]

---

[1] 18 Pa. C.S.A. 3701(a)(1)(i).
[2] 18 Pa. C.S.A. 903(a)(1), 3701(a)(1)(i).
[3] 18 Pa. C.S.A. 2502(b).
[4] "Whenever a notice of appeal to the Superior Court is filed, the Prothonotary shall send a docketing statement form which shall be completed and returned within ten (10) days in order that the Court shall be able to more

1

After some investigation, it became apparent that the failure to comply with Rule 3517 was due to a miscommunication between the trial court and the appellate court.[5] Attorney Leslie, on behalf of the Appellant, filed a Motion to Reinstate Appeal rights, which we granted on October 9, 2014. The Appellant filed his Notice of Appeal to the Superior Court on November 5, 2014, which is docketed at 1873 MDA 2014. We directed the Appellant to file his Concise Statement, which he did on November 25, 2014.

On appeal he argues that the Commonwealth presented insufficient evidence to find him guilty beyond a reasonable doubt and that the jury's verdict was against the weight of the evidence. The testimony presented at the Appellant's trial can be found in the original record at Notes of Testimony 2/10-2/14/2014. Pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the following is our opinion addressing the Appellant's issues on appeal.

**Factual and Procedural History:**

In the early morning hours of November 6, 2012, Officer Christopher Roosen was dispatched to a residence on West Princess Street in the City of York, Pennsylvania. (N.T. 2/10-2/14/2014 at 102). Officer Roosen entered the residence and was brought to the back dining room area where he observed the victim, Edward Green, lying on the floor. (Id. at 103). Although Officer Roosen was dispatched for a shots fired call, he was unable to see any gunshot wounds at that time. (Id. at 103-04). While waiting for the ambulance, Officer Roosen attempted to get as much information about what happened as possible. (Id. at 104-06). The victim stated that

---

efficiently and expeditiously administer the scheduling of argument and submission of cases on appeal. Failure to file a docketing statement may result in dismissal of the appeal." Pa. R.A.P. 3517.

[5] It appears that the Superior Court did not get notice of Attorney Semke's withdrawal and our appointment of Attorney Leslie before dismissing Appellant's case.

2

he was shot in his car, which was parked out back of the residence, and that the two people that shot him had stolen his car. (Id. at 104). Although the victim did not know the identities of the two people that shot him, he was able to tell Officer Roosen that it was two black males who looked to be "fresh out of diapers." (Id. at 105).

Officer Roosen testified that when the ambulance arrived, medical personnel discovered three gunshot wounds. (N.T. 2/10-2/14/2014 at 105). After the victim was taken to the hospital Officer Roosen was able to determine that the victim's car was a 2007 Toyota Camry Hybrid. (Id. at 106). Lastly, Officer Roosen testified that the west side of York has been his primary patrol area, and that he has seen the Appellant and his co-defendant, Malcolm Bull, together about a dozen different times. (Id. at 110).

Next, the Commonwealth called Officer Chad Howell. Officer Howell's main responsibility was to meet up with the victim at York Hospital and attempt to gain more information. (N.T. 2/10-2/14/2014 at 113-14). However, Officer Howell was unable to speak with the victim because he had been taken into surgery. (Id.). So, at that time, Officer Howell collected the victim's clothing and belongings as evidence.[6] (Id. at 114). On cross-examination, Officer Howell testified that he briefly spoke with Toni Hooper, a resident of 448 West Princess Street, and she told him that she believed the victim had been carjacked by two males. (Id. at 116).

The Commonwealth called three more York City Police officers. Officer Jeffrey Gilliland helped with the collection of evidence and the taking of initial statements from witnesses. (N.T. 2/10-2/14/2014 at 119-20). Officer Gilliland did observe some spots of blood in the parking lot, but did not find any shell casings. (Id. at 120). Officer Christopher Perry, who began his shift at 6:00AM on November 6,

---

[6] Officers found a key FOB in the victim's pants pocket. (N.T. 2/10-2/14/2014 at 113-14). The victim's 2007 Camry was a keyless ignition. Without the key FOB the car would not start.

3

2012, was briefed on the situation and began looking for the stolen car while on regular patrol. (Id. at 123-24). As he was driving down Cookes House Lane, which is approximately half a block from the crime scene, Officer Perry observed clothing and other debris strewn about the road. (Id. at 125-26). Officer Perry did not immediately recognize the significance of the items until he saw the victim's name on a piece of mail. (Id. at 126). At that point he requested crime scene technicians to come to his location. (Id.). Officer Chuck Crumpton was dispatched to the crime scene to assist other the officers. (Id. at 141-42). Not too long after his arrival, Officer Crumpton smelled an odd odor. (Id. at 143-44). He was unable to identify it, but he testified that it smelled like burning rubber or plastic. (Id. at 144). Later that day, around 10:00AM, Officer Crumpton was at the same facility the victim's car was being held at. (Id. ). While there he noticed the same smell coming from the victim's car that he smelled hours earlier at the crime scene. (Id. at 144-45).

Detective Matthew Luchko found the victim's stolen car behind 435 West College Street around 8:30AM on November 6, 2012. (N.T. 2/10-2/14/2014 at 133). Detective Luchko testified that the location where the car was found is about a block from the crime scene. (Id.). Upon opening the door, Detective Luchko testified that it was apparent that someone had tried to set the car on fire. (Id. at 134). While he investigated the car, a woman by the name of Jentilla Maria Peters came out from her house asking if it was his car. (Id. at 135). Detective Luchko informed her that it was not his car, and she later spoke with police. (Id.). On cross-examination, Detective Luchko indicated that from the location of the car you could see the crime scene. (Id. at 137-38).

The Commonwealth called Officer Ryan Anderson, who was the lead evidence technician. (N.T. 2/10-2/14/2014 at 150). Officer Anderson was called into work around 4:00AM on November 6, 2012. At the actual crime scene, Officer Anderson

4

was unable to find any shell casings, which in his experience usually means a revolver was used. (Id. at 155). With respect to the mail found on Cookes House Lane, Officer Anderson noticed that some of the mail contained latent footprints.[7] (Id. at 159-61). These pieces of mail were sent to the Pennsylvania State Police Crime Laboratory for further analysis. (Id. at 161). While at the victim's autopsy, Officer Anderson collected the following: a sample of the victim's blood, the victim's fingerprints, the victim's fingernail clippings, a sample of the victim's hair, and two projectiles. (Id. at 163). Lastly, Officer Anderson processed the victim's Toyota Camry, which was a keyless ignition vehicle.[8] (Id. at 167-68). Upon initial investigation, Officer Anderson noted that someone had tried to set the car on fire. (Id. at 168). He specifically remembered the nauseating smell, and explained that technicians had to wear masks while processing the vehicle. (Id.). The vehicle was processed for fingerprints, and Officer Anderson found 17 usable prints that were sent to the Pennsylvania State Police Crime Lab for analysis. (Id. at 169-71). The vehicle was also tested for the presence of gunshot residue, and the results of those tests were sent to RJ Lee Group for analysis. (Id. at 172-74).

On cross-examination, Officer Anderson clarified that more than 17 fingerprints were found on the vehicle, but he determined only 17 of those fingerprints were usable. (N.T. 2/10-2/14/2014 at 212-14).

Toni Hooper, a friend of the victim's, testified next. She had known the victim, who she called PeeWee, for about a year. (N.T. 2/10-2/14/2014 at 218-19). Ms. Hooper testified that the victim was going through some hard times, so he had been sleeping in his car for the last two months. (Id. at 219-20). On the night of the

---

[7] Officer Anderson also received a pair of Timberland boots belonging to the Appellant and a pair of Nike sneakers belonging to the co-defendant Malcolm Bull.

[8] In order to start the vehicle, the operator has to have the key FOB within 3 feet of the vehicle. If the vehicle is already running, and the key FOB is taken out of the 3 foot range, the vehicle will continue to run until it is turned off. The vehicle cannot be restarted unless the key FOB is back within range.

Circulated 10/29/2015 12:26 PM

homicide, Ms. Hooper testified that she was up in her bedroom playing a game on her computer when she heard gunshots. (Id. at 221-23). She ran to the window and saw two boys around the victim's car. (Id. at 222-23). She saw the victim get out of the driver's side and one of the boys get into the passenger side. (Id. at 223). The other boy came around to the driver's side and shot the victim three more times. (Id.). By the time she ran downstairs Shawn Hamlin, Ms. Hooper's roommate, had already let the victim inside the house. (Id. at 224). Ms. Hooper then called the police. (Id.). Although Ms. Hooper was unable to see who the suspects were, she was able to tell police that they were African-American. (Id. at 225).

On cross-examination, Ms. Hooper stated that she saw two boys running towards the victim's car shooting guns. (N.T. 2/10-2/14/2014 at 232). She also testified that both boys were shooting and that there were two guns. (Id. at 234). Ms. Hooper indicated that no shots were fired from the passenger door area; all shots were fired while the boys were running towards the car. (Id. at 235). However, she did state that the events of that night happened very fast. (Id. at 236).

The next witness for the Commonwealth was Kenneth Chambers, Ms. Hooper's boyfriend and friend of the victim. Mr. Chambers had known the victim for approximately a year, and had offered to let the victim stay in the house rent free, but the victim was too proud to accept. (N.T. 2/10-2/14/2014 at 245-46). On the night of the homicide, Mr. Chambers was up in the bedroom with his girlfriend. (Id. at 247). Unlike his girlfriend, Mr. Chambers did not see any gunshots, but he did see two males get into the victim's car. (Id. at 247-48). Mr. Chambers went downstairs and saw the victim lying on the floor. (Id. at 249-50).

On cross-examination, Mr. Chambers admitted that his eyesight is not very good. (N.T. 2/10-2/14/2014 at 251). He also testified that he did not actually see two people get into the car, but he did see two doors close. (Id. at 252).

6

Shawn Hamlin, a friend of the victim's for about 30 years, testified for the Commonwealth. (N.T. 2/10-2/14/2014 at 273-74). He did not actually see the homicide, but he did hear gunshots and the victim yelling outside of the door. (Id. at 276). He let the victim inside and the victim repeatedly said "they shot me." (Id.). Mr. Hamlin could not see any bullet holes, but he did see blood. (Id.). On cross-examination, Mr. Hamlin testified that he told the police he thought the shooter might have been someone who knew the victim's routine because the victim did the same thing every night. (Id. at 278).

The Commonwealth also called Jentilla Maria Peters. Ms. Peters, who goes by Maria, lived in the house where the victim's car was found. (N.T. 2/10-2/14/2014 at 259-61). She stated that the car was not in her driveway when she went to bed around 10:00PM on November 5, 2012, but that she saw it in her driveway around 8:00AM on November 6, 2012. (Id. at 261). Ms. Peters remembered waking up in the middle of the night, around 2:00AM, because she heard rattling on the side of her house. (Id. at 262). She got out of bed and looked out her bedroom window, which is located in the front of the house.[9] (Id.). With some hesitation, Ms. Peters told the jury that she saw two individuals running from her porch. (Id. at 262-63). Although she did not recognize one of the individuals, she did recognize the co-defendant Malcolm Bull. (Id. at 263). On cross-examination, Ms. Peters indicated that she did not want to be testifying, and that she was not 100% sure of anything. (Id. at 267-68). She also stated that she knew Malcolm Bull because that summer she saw him running down the street shooting a gun. (Id. at 269).

Dr. Michael Johnson, a forensic pathologist, performed the autopsy on the victim. (N.T. 2/10-2/14/2014 at 287). After explaining normal protocol for performing an autopsy, Dr. Johnson testified that the victim's cause of death was

---

[9] Ms. Peters' driveway is located in the back of her house.

7

multiple gunshot wounds. (Id. at 288-90, 298). Specifically, the victim was shot three times: once in the torso, once in the left hand, and once in right leg/thigh. (Id. at 290). The bullet that entered the victim's torso traveled through the right side of the victim's body hitting the diaphragm, liver, and heart. (Id. at 291). However, that bullet was not recovered from the heart; it was actually recovered from the victim's kidney. (Id. at 292). Dr. Johnson explained that if the bullet is small enough it can enter the blood stream and be pumped to other areas of the body. (Id.). Lastly, Dr. Johnson testified that the victim suffered injuries to vital parts of the body. (Id. at 299). On cross-examination, Dr. Johnson stated that he could not tell how far away the gun was from the victim when he was shot. (Id. at 299-300).

The next two Commonwealth witnesses, Julia Patterson and Corporal Randy Mocello, were admitted as experts without objection. Julia Patterson, a forensic scientist, received six samples taken from the passenger side of the victim's car. (N.T. 2/10-2/14/2014 at 310). It was her job to test these samples for the presence of gunshot residue. (Id. at 309-10). Ms. Patterson explained that in order to definitively determine that gunshot residue is present, three components must be present. (Id. at 308). Of the six samples tested, all six had at least one component, but none of the six had all three components. (Id. at 311-12). However, Ms. Patterson testified that the components that were available were consistent with gunshot residue. (Id. at 312-13). She also stated that a fire would not leave these particular components. (Id. at 314).

Corporal Randy Mocello, is employed by the Pennsylvania State Police as a latent print examiner. (N.T. 2/10-2/14/2014 at 316). He was given numerous latent fingerprints and foot impressions to examine and compare to known samples. (Id. at 328). Out of the latent fingerprints submitted to Corporal Mocello, he was able to find 11 of them belonged to the victim, 4 belonged to the co-defendant Malcolm Bull, and 4 were inconclusive. (Id. at 331-32). Corporal Mocello also analyzed several

8

pieces of mail containing shoe impressions. (Id. at 334). To compare impressions, he was given Timberland boots belonging to the Appellant and Nike sneakers belonging to the co-defendant Malcolm Bull. (Id. at 335). After comparing the sneakers to the impressions found, Corporal Mocello was able to eliminate them as a source for making the impression. (Id. at 335-36). However, Corporal Mocello was able to make a limited association between a couple of the impressions and the Appellant's Timberland boots. (Id. at 336).

On cross-examination, Corporal Mocello told the jury that when it comes to fingerprints no two are the same; there is either an absolute identification or there is no identification at all. (N.T. 2/10-2/14/2014 at 345-46). He also testified that the prints belonging to Malcolm Bull were lifted from the passenger side of the victim's vehicle. (Id. at 347-48).

York City Police Officer Richard Peddicord, a member of the United States Marshal Warrant Detail Task Force, testified that he was searching for the co-defendant Malcolm Bull on November 13, 2012. (N.T. 2/10-2/14/2014 at 370-71). Officers received information on the co-defendant's whereabouts and proceeded to that location. (Id. at 371-72). Officers found the co-defendant in a second floor closet; the Appellant was in the closet with him. (Id. at 372). On cross-examination, Officer Peddicord explained that Malcolm Bull was arrested on felony drug charges, while the Appellant was arrested for failing to pay costs and fines. (Id. at 370, 373).

The next witness for the Commonwealth was the co-defendant Malcolm Bull. He testified that on the night of the homicide, he and the Appellant were walking back to Appellant's house when they noticed a white car with the music playing. (N.T. 2/10-2/14/2014 at 378-79). According to Mr. Bull, it was the Appellant who wanted "to go check it out," which meant he wanted to rob the man sleeping in the car. (Id. at 379-80). Mr. Bull stated that the Appellant walked up to the passenger side door,

9

opened it, and started shooting. (Id. at 380). Mr. Bull testified that while this was happening he was standing by the trunk of the car. (Id.). He said that the victim exited the car and the Appellant shot him one more time before getting in the driver's side. (Id. at 381-82). Mr. Bull got in the passenger side and the Appellant drove away. (Id. at 382). He said they drove over to Cookes House Lane and began going through the victim's belongings to see if there was anything of value. (Id. at 382-83). While doing this, the Appellant was throwing unwanted clothes and papers onto the street. (Id. at 383).

Mr. Bull testified that after the two looked through the car, he got into the driver's side and drove the car to College Street where he parked it in someone's driveway. (N.T. 2/10-2/14/2014 at 384-85). He said the Appellant lit the car on fire and the two ran to the Appellant's house. (Id. at 385, 387). Mr. Bull also told the jury that they could see the cops responding to the crime scene when they ditched the victim's car in Ms. Peters' driveway. (Id. at 389).

The next line of questioning revolved around the gun the Appellant used to shoot the victim. Mr. Bull admitted that he had the gun earlier that day and he used it to shoot an individual named Ronald Rhoades. (N.T. 2/10-2/14/2014 at 389).[10] When asked who owned the gun, Mr. Bull said that both he and the Appellant owned the gun. (Id.).

After being arrested on the felony drug warrant, Mr. Bull testified that he was initially uncooperative with respect to the shooting in this case. (N.T. 2/10-2/14/2014 at 392). However, he was fully willing to admit to shooting Ronald Rhoades. (Id. at 393). Mr. Bull testified that he did not want to talk about this case because he did not

---

[10] Mr. Bull was charged with Attempted Homicide for that shooting. *See CP-67-CR-8261-2012.*

10

want to get the Appellant, or himself, in trouble.[11] (Id. at 393-94). A few days later, at the request of Mr. Bull's girlfriend, detectives came to visit him in York County Prison. (Id. at 394). At this point, Mr. Bull did not have any kind of deal secured in exchange for his testimony. (Id. at 395). The story Mr. Bull told detectives was essentially the same story he testified to with one exception; Mr. Bull said that after driving the car to Cookes House Lane, he left and the Appellant called him later and that is when they drove the car over to College Street to dump it. (Id.). A deal was still not offered to Mr. Bull at this time. (Id.).

Mr. Bull admitted that after pointing the finger at the Appellant, he later retracted his statement. (N.T. 2/10-2/14/2014 at 396). He did this by writing out a statement in prison and having it notarized. (Id.). However, he stated that someone else told him what to write and he just copied it. (Id.). Mr. Bull gave this letter to the Appellant's brother and that is how the statement got to the District Attorney's office. (Id. at 397).

It was not until this written statement that Mr. Bull was offered a deal in return for his testimony. (N.T. 2/10-2/14/2014 at 400-01). In exchange for his truthful testimony against the Appellant, Mr. Bull would plead guilty to both the Attempted Homicide of Ronald Rhoades and the present case. (Id. at 401). The Commonwealth would then agree that his sentence would be capped at 20 to 40 years incarceration. (Id.).

On cross-examination, defense counsel questioned Mr. Bull extensively regarding his prior lies to the police. (N.T. 2/10-2/14/2014 at 412, 420-39).[12]

---

[11] His initial statement to police was that he was on another street when he heard gunshots and ran to a friend's house. (N.T. 2/10-2/14/2014 at 393). On his way home from his friend's house, he walked down Cookes House Lane and saw all the victim's belongings. (Id. at 393-94). He touched some of those items and that is how his fingerprints were found. (Id.).
[12] Mr. Bull made inconsistent statements regarding ownership of the gun, the Appellant's shoes, his whereabouts on the day of the homicide, and whether he drove the victim's car that night.

11

Defense counsel also questioned Mr. Bull about the shooting of Ronald Rhoades. Mr. Bull testified that he shot Rhoades in broad daylight with at least three witnesses. (Id. at 418-19). After stating he did not know whether Rhoades had lived, he testified that he went about his day; he was not worried at all and it was "sheer luck" he did not kill Rhoades. (Id. at 419-20, 429). Mr. Bull also maintained that he did not know the victim even though his brother Raymond worked with him. (Id. at 420). He also testified that he was not afraid of doing a life sentence for something he did, but he was not going away for life for something he did not do. (Id. at 435). Lastly, Mr. Bull testified that during his interrogation the police told him that the Appellant would blame him if he did not flip first. (Id. at 439).

On redirect, Mr. Bull admitted that he paid for the gun, but that both he and the Appellant used the gun for protection. (N.T. 2/10-2/14/2014 at 443). Mr. Bull testified that while he was trying to save himself from life in prison, he was telling the truth. (Id.). On recross, Mr. Bull stated he went to the Appellant's house after he shot Rhoades. (Id. at 445). He admitted to telling the Appellant and his family that he just shot someone, but he denied saying he told the Appellant's father he needed a car to get out of town. (Id. at 445-46).

The last witness for the Commonwealth was York City Detective George Ripley. He was the lead investigator on both the Rhoades attempted homicide and the homicide in this case. (N.T. 2/10-2/14/2014 at 448). Detective Ripley, who interviewed Malcolm Bull, testified that Mr. Bull never verbally indicated the Appellant was not involved in the homicide, but he did write a letter to that effect. (Id. at 457). On cross-examination, Detective Ripley testified that it was likely investigators who first brought up the Appellant's name, not Malcolm Bull. (Id. at 463-64). In fact, in Mr. Bull's initial statement to detectives he repeatedly insisted

12

that the Appellant was not with him in the early morning hours of November 6, 2012. (Id. at 463).

The Commonwealth rested, and the defense called Derek Trone. Mr. Trone, who works for York County Prison, notarized Malcolm Bull's letter that denied the Appellant's involvement in the crime. (N.T. 2/10-2/14/2014 at 479-80). Mr. Trone testified that he verified Malcolm Bull's identity by his prison wristband and asked him if this statement was his. (Id. at 480). According to Mr. Trone, Malcolm Bull said it was his statement and that it was true to the best of his knowledge. (Id. at 480-81). On cross-examination, Mr. Trone said it was not his job to ask how the words got on the paper. (Id. at 482).

The defense called Azmire McCowin, the Appellant's brother. He testified that he never asked or threatened Malcolm Bull to write the letter. (N.T. 2/10-2/14/2014 at 485). He stated that Malcolm Bull approached him while the two were incarcerated in York County Prison and said that he wanted to retract his statements implicating the Appellant. (Id. at 484). Azmire told Malcolm Bull that if he wrote it in a letter, he would send it to his grandfather. (Id.). On cross-examination, Azmire did admit that he did not want to see his brother get in trouble. (Id. at 486).

Marquez McCowin, the Appellant's brother, testified next for the defense. Marquez was at his brother's house the night of the homicide. (N.T. 2/10-2/14/2014 at 489). He testified that when he got to his brother's around 6:00PM or 7:00PM Malcolm Bull was already there, along with a few other people. (Id.). Marquez said that Malcolm Bull was talking about shooting Ronald Rhoades earlier that day and that he was looking for a way out of town. (Id. at 490-92). Marquez was shown a picture of the victim's car, which he said he recognized. (Id. at 492). He also said that pretty much everyone he knows, including Malcolm Bull, wears Timberland boots. (Id. at 495). On cross-examination, Marquez was unable to recall the model or

13

any unique features about the victim's car other than that it was white. (Id. at 496-98).

The last defense witness was Sequita Brown, the mother of the Appellant's child. (N.T. 2/10-2/14/2014 at 501). She was also at the Appellant's house on the night before the homicide. (Id.). She specifically remembered that day because she and the Appellant had a fight over their son staying the night with his father. (Id. at 503). On cross-examination, Ms. Brown testified that she left around midnight and that Malcolm Bull was still at the Appellant's house when she left. (Id. at 505-06).

The defense rested, the attorney's gave their closing arguments, and the jury was instructed. The jury returned verdicts of guilty on Count 3 Robbery, Count 4 Conspiracy to Commit Robbery, and Count 8 Second Degree Murder. (N.T. 2/10-2/14/2014 at 625). The Appellant was sentenced to a term of life imprisonment on March 24, 2014. He filed a Post-Sentence Motion on April 3, 2014, which we denied on July 29, 2014.

The Appellant filed his initial Notice of Appeal to the Superior Court on August 4, 2014, docketed at 1318 MDA 2014. On the same day, the Appellant's attorney, Marc Semke, Esquire, filed a Motion to Withdraw and Appoint New Counsel. On August 5, 2014, we appointed Korey Leslie, Esquire, and directed the Appellant to file his 1925(b) Statement. We granted defense counsel's request to extend the time to file his Concise Statement on August 28, 2014.

On September 25, 2014, the Superior Court dismissed the case for failure of defense counsel to comply with Pennsylvania Rule of Appellate Procedure 3517. After we looked into the matter, it became apparent that the failure to comply with Rule 3517 was due to a miscommunication between the trial court and the appellate court. Attorney Leslie, on behalf of the Appellant, filed a Motion to Reinstate Appeal rights, which we granted on October 9, 2014. The Appellant filed his Notice of

14

Appeal to the Superior Court on November 5, 2014, which is docketed at 1873 MDA 2014. We directed the Appellant to file his Concise Statement, which he did on November 25, 2014.

**Issues:**

    I.      Did the Commonwealth present sufficient evidence to establish each element of each count beyond a reasonable doubt?

    II.    Were the jury's guilty verdicts against the weight of the evidence?

**Discussion:**

*Sufficiency of the Evidence:*

As a preliminary matter, it should be noted that "when challenging the sufficiency of the evidence on appeal, the "[a]ppellant's [court ordered Pa. R.A.P. 1925(b) concise] statement must specify the element or elements upon which the evidence was insufficient in order to preserve the issue for appeal." *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. Ct. 2009). If the appellant fails to conform to the specificity requirement, the claim is waived. Id. In the present case, the Appellant's 1925(b) Statement states "Mr. McCowin, the appellant, avers that his convictions were against the weight of the evidence and sufficiency of the evidence presented at trial." 11/25/2014. It is our opinion that this statement is not sufficiently specific. It does not state which crimes or elements of a crime are being challenged. However, we will analyze the Appellant's arguments anyway.

The standard of review for an appellate court reviewing a sufficiency of the evidence claim is well settled:

'The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the

15

fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.'

*Commonwealth v. Charlton*, 902 A.2d 554, 563 (Pa. Super. Ct. 2006) (quoting *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. Ct. 2001).

The Appellant was convicted of Second Degree Murder, which is defined as **"(b) Murder of the second degree.--**A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa. C.S.A. § 2502(b). The phrase "perpetration of a felony" is defined as "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery. . . ." 18 Pa. C.S.A. § 2502(d). The "principal" is "a person who is the actor or perpetrator of the crime." 18 Pa. C.S.A. § 2502(d). The Appellant was also convicted of Robbery, which is defined as "**(a) Offense defined.--**(1) A person is guilty of robbery if, in the course of committing a theft, he: (i) inflicts serious bodily injury upon another." 18 Pa. C.S.A. § 3701(a)(1)(i).

16

The Commonwealth presented sufficient evidence to allow a jury to find each element of the above offenses beyond a reasonable doubt. First, there is no question that the victim, Edward Green, was killed while the suspects stole his car. Second, the testimony of Toni Hooper, Kenneth Chambers, and Shawn Hamlin establish that two people were involved the night the victim was killed.[13] Jentilla Maria Peters, the woman who owned the house where the victim's car was found, saw the co-defendant Malcolm Bull and another individual running from her house. Officer Christopher Roosen testified that he had seen Malcolm Bull and the Appellant together on numerous occasions, and Officer Peddicord, the arresting officer, found the two hiding out in a closet. Malcolm Bull also testified that he and the Appellant were good friends.

Although Mr. Bull initially lied to police about the events surrounding the homicide, he not only lied about his involvement, but the Appellant's involvement as well. It was not until the police began putting the pieces of the puzzle together that Mr. Bull began telling the truth. Eventually he admitted to being present and helping the Appellant steal the victim's car. It is important to note that Mr. Bull did all of this without the benefit of a plea deal.[14]

Although the only witness definitively placing the Appellant at the crime scene was Malcolm Bull, a reasonable jury could have believed his testimony. That testimony established that the Appellant, while stealing the victim's car, inflicted serious bodily injury by shooting and killing the victim. Thus, there was sufficient evidence to support a Robbery conviction. Because that Robbery resulted in a death, the Commonwealth also presented sufficient evidence to support a Second Degree Murder conviction. Even if the jury did not believe the Appellant was the actual

---

[13] The victim himself said "they shot me" repeatedly.

[14] As previously mentioned he did receive a sentence of 20-40 years in exchange for his truthful testimony against the Appellant. This agreement was at the insistence of Mr. Bull's attorney.

shooter, the testimony established that he was at the very least an accomplice to the perpetration of a felony. The standard is clear: the Commonwealth "need not preclude every possibility of innocence." *Charlton*, 902 A.2d at 563. Therefore, the Commonwealth presented sufficient evidence to establish guilt beyond a reasonable doubt on both Robbery and Second Degree Murder.

Lastly, the Appellant was convicted of Conspiracy to Commit Robbery, which is defined as

> **(a) Definition of conspiracy.**--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime.

18 Pa. C.S.A. § 903(a)(1). As previously mentioned, the Commonwealth established that the Appellant committed the crime of Robbery. Mr. Bull testified that as he and the Appellant were walking down the street, the Appellant stated he wanted to rob the victim who was sleeping in his car. Mr. Bull followed the Appellant to the victim's car where he witnessed the Appellant shoot the victim. The two got into the victim's car and drove away. This testimony establishes that Mr. Bull and the Appellant had an agreement to commit a robbery; therefore, the Commonwealth presented sufficient evidence.

While we may have reservations about the deal made with Malcolm Bull in exchange for his testimony, the jury was well aware of this deal and his misdeeds. It was the jury who observed Mr. Bull while he testified and the jury is free to believe all, part, or none of a witness's testimony. *Charlton*, 902 A.2d at 563. The jury could have believed all of Malcolm Bull's testimony, which would mean the Appellant was the one who shot the victim. Or, the jury could have believed part of Mr. Bull's

testimony. For example, the jury could have believed that the Appellant was present at the crime scene, but that it was Malcolm Bull who pulled the trigger. Either way, the Appellant was still at the very least present, which makes him guilty of the above crimes. Therefore, the Commonwealth presented sufficient evidence on each charge to prove each element beyond a reasonable doubt.

*Weight of the Evidence:*

The Appellant argues that the jury's guilty verdicts were against the weight of the evidence; we disagree. An appellate court reviewing a weight of the evidence claim uses the following standard of review:

> 'The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.'

*Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa. Super. Ct. 2006) (quoting *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003)).

The Appellant filed a Post-Sentence Motion challenging the weight of the evidence on April 3, 2014. After a hearing, we denied Appellant's weight of the evidence claim finding that a reasonable jury could have found Malcolm Bull's testimony credible and to do so did not shock the Court's sense of justice. Order, 7/29/2014. As stated previously, defense counsel highlighted Malcolm Bull's many shortcomings, but this is not reason enough to conclude that the jury's verdicts were

19

against the weight of the evidence. The jury does not have to like the witnesses in a trial in order to find their testimony credible. Further, Mr. Bull's version of events was corroborated by the physical evidence; components consistent with gunshot residue were found on the passenger side of the vehicle and foot impressions found on the victim's mail were consistent with the Timberland boots the Appellant owned. The physical evidence coupled with the testimony of Toni Hooper, Kenneth Chambers, Shawn Hamlin, and Jentilla Maria Peters could have led a reasonable jury to believe Malcolm Bull. Therefore, this Court did not abuse its discretion when we denied Appellant's Post-Sentence Motion, and the jury's verdicts were not against the weight of the evidence.

**Conclusion:**

We admit that the Commonwealth's case against Appellant rested in large part on the testimony of Malcolm Bull. Although Mr. Bull had some motivation to lie, the basics of his testimony were corroborated by the other evidence presented by the Commonwealth. Therefore, we respectfully submit that the Appellant's arguments are without merit.

By the Court:

Date: 12/22/14

Richard K. Renn, Judge

20